Thank you, Your Honors. My name is David Ness and I represent Wendell Kopp. As the Court is aware, Mr. Kopp was convicted of drugs and firearms charges and sentenced to life imprisonment. His life term didn't result, strictly speaking, from the fact that he sold drugs or even from his convictions, but rather from the jury's quantity finding. And that, I think, is my major disagreement with the government with respect to the way we've approached this case. The errors we've alleged on appeal, I think, need to be viewed in the context of the jury's quantity findings, not necessarily whether or not the jury could have reasonably found that Mr. Kopp conspired or possessed with intent to distribute methamphetamine. So the jury was asked to return a special verdict on quantity? It was, Your Honor, and it was given three choices, and the jury decided that he had distributed over 500 grams of methamphetamine. And there was testimony, I take it, in addition to the quantities of drugs actually seized or bought and sold, there was testimony from the cooperating witnesses as to the volume of business that Mr. Kopp was engaged in. Right, and I would say that the jury's quantity finding had to result solely from the testimony of the two cooperating witnesses. Well, it couldn't be solely because there were actually quantities seized here. So I suppose you could argue that all they did was corroborate the testimony of the CI, but this is not a drugless conspiracy case, is it? This is not a drugless conspiracy case, and that's where I was getting. I think during the three stops, Mr. Kopp had a bad habit of getting pulled over and stuff, or bad luck or a combination of the two. Let's say he had a modus operandi after about the third time. 404B evidence might be appropriate in that context, if not in that involved here. But they found, I think it was 66 grams of methamphetamine total during those three stops. Well, then wasn't there a search of the motel room of a co-conspirator? That's correct. I mean, in total, how much dope did we have here? The actual amount of drugs, I think they found 129 grams of actual drugs in the hotel room, if my memory is correct. And then $26,000, which was... Okay, and the special finding was in excess of, what, $1,500? $500. $500. Okay, so they got... And so where on the errors that you've alleged, what do you think is your best case for undermining this quantity issue? Well, there's, I guess, the major one, which I've raised under plain error, but I think that that's whether or not Mr. Kopp should be responsible for quantities of drugs found after he was arrested. And I think that that also feeds into the issue involving Christy Cotta's informant file. And the reason why it does is this, is that we know from the testimony that Christy Cotta was playing two sides of the fence. She was Mr. Kopp's boyfriend. She was also the supplier's boyfriend. She was getting methamphetamine that Mr. Kopp didn't know about from the supplier. She had her own business going on the side. And so to hold him responsible for activities that were effectively actually concealed from him during the time he was actively involved in the so-called conspiracy, I think, stretches the legal fiction. Did you make that argument to the jury? I wasn't the trial lawyer. Or did Kopp's lawyer make that argument to the jury? No, he did not. And that's why it's raised under plain error. So as a result, I take it there was no multiple conspiracy instruction given. There was no multiple conspiracy instruction given. And more specifically, the issue I raise is that there was an effective withdrawal when Mr. Kopp was arrested. Well, that would go to the timing of his arrest versus the search of the what was the time difference between when he's sitting in the Yellowstone County block up and the search warrants being executed on his. It's about a week, five days or a week, I believe. I think he was arrested during the early morning hours of November 14th. And then I think that the hotel room was searched on November 19th. So to prevail on this argument, you would have to convince the jury that even though the drugs were seized from the same source of supply that both Kopp and Cotta were getting their drugs from, that somehow that was a different conspiracy and that the conspiracy as a matter of law ends as soon as he lands in jail. Right, his role in the conspiracy and therefore his ability or his Pinkerton liability should have ended when he was arrested. But why wouldn't that also be true every time he landed in jail on his three other arrests in the course of the conspiracy? I mean, the problem is that we have co-conspirators arrested all the time, but the drug business keeps going and sort of one of the risks of doing business is occasionally you're taken out of circulation when the police arrest you and then you bond out and go back to your dirty drug business. And that's, I think, what happened during his first two arrests. He was bonded out fairly quickly. And as I said, I think that the jury could reasonably conclude that he can. But he didn't do any of the traditional things. He didn't cooperate with, offer to cooperate with law enforcement as soon as he was arrested, didn't renounce, you know, Satan and all his works. No evidence he was baptized. On a plein air review or even not plein air review, what would be the basis for having such a withdrawal instruction? I mean, what is the factual basis? Well, the factual basis is that he was arrested. And then I think it's up to the jury, once they're properly given a withdrawal instruction, to determine whether or not they should hold him responsible for drugs that were found. But that kind of goes back to Judge Talman's point of the mere arrest doesn't necessarily net you such an instruction because of the way that these drug conspiracies work. So we'd have to, it would be plein air for the district court not to sua sponte, provide the Pinkerton withdrawal instruction simply because he was arrested. That's essentially the holding we'd have to make to go in your favor, isn't it? Well, I'd say this is that while he's not per se barred from attribution of drugs that were involved in the conspiracy after he was arrested, I would say that once someone is arrested and they are effectively out of the conspiracy, they can't control their co-conspirator's actions, especially in drug cases, that they should at the very least be allowed and should be granted an instruction on withdrawal so that the jury can take that into consideration. But how do we deal with the problem that I was talking with you about earlier where co-conspirators do get arrested from time to time and part of the ongoing drug operation is to supply the bail money that we post to get them out so that they can continue their activity? And conceptually, I'd just say I've somewhat struggled with this. I think when, say you have the type of a conspiracy where someone conspires to manufacture a certain amount of methamphetamine or to rob a bank or something like that, and while certain overt acts have taken place, the crime hasn't been consummated yet. They go to jail. I would agree that probably they should be held responsible for that. But, Judge, as you stated, drug conspiracies go on forever. I mean, even to kind of conceptually limit these things to, I mean, why? We limit these things all the time. Why not bring these things all the way back to the manufacturers in Mexico? Well, so in these types of cases where one person goes to jail, someone takes his place, and it just keeps going, I think that the jury should be given the opportunity to say, hey, we're not going to attribute quantities to this fellow once he's in jail. He can't foresee what his co-conspirators are doing. Is it clear in this case that quantities, I'll say sold or distributed after he went to jail, were used in his quantity determination? I'd say looking at the, and I made a fairly lengthy quote from the government's closing argument in this case, and the government used the drugs and the money that was found inside the hotel room after Mr. Kopp was arrested, and actually sort of orally went through the calculations that the jury would have to make and said, so there's your 500 grams. Because they didn't find more than 500 grams on Mr. Kopp, and otherwise the only testimony was his co-conspirators, who the jury was entitled to believe them. But here we don't even know whether or not the jury's verdict rested on their testimony or rested on the government's argument as to what was found in the hotel room. But I thought, I think Judge Tshishima was asking, though, whether there were additional sales in that week period that were charged against Kopp as part of the conspiracy. I guess his girlfriend, Christy Cotta, was arrested in a controlled buy at a casino, and that happened, I believe, on the day that the hotel room was searched. And evidence was presented to that. I would assume that the jury, without a withdrawal instruction, would attribute that to Mr. Kopp. I think you'd have a much stronger argument if the temporal gap was longer than a week. But I guess given the nature of drug-dealing conspiracies and the number of people that were involved in this one, I'm wondering why, as a matter of plain error review, that would be enough if it's only a week. I guess maybe touching back to Judge Tshishima, the government argues that if you take this testimony from Cotta and Berger Science, that if you add everything up prior to the post-arrest amounts, that you still get way in excess of 500, because they're talking about at least 17 ounces per day, and they couch it in 10 ounces per day. And if you add up the per days, you get over 500. So their argument, as I read it, is, well, all this in the end doesn't get you too far because you get above the 500 in any event. Do you have a comment on that? I guess I would just go back and point to the government's argument and respond that we don't know if the jury credited Christie Cotta's testimony or if they followed the government's argument and bought into the argument that what was found in the hotel room should have been attributed to him and said, okay, so that's 500 grams. And, of course, I'm almost out of time here, but just kind of following up on what I said, I think that Christie Cotta's testimony was critical here, and so I just emphasize the argument having to do with her informant file. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'm Leif Johnson from Montana for the United States. I'd like to just lay out for the Court quickly how we went about proving quantity in this case. There were really three means of proving the jurisdictional amount. First, as we've stated in the brief, we relied on Christie Cotta, the informant, to basically establish that they were buying and distributing more than 10 ounces a day. That gets us there very quickly since the conspiracy with her went on from early in September all the way until mid-November. Obviously, that was an actual quantity seized. That was testimony. On the actual quantity seized side of the coin, as Mr. Ness mentioned, up until the Vargas room search, I think, there was not enough actual quantity seized to establish the jurisdictional amount. At the Vargas room seizure, however, and the record reflects that there were some 170 grams of methamphetamine seized, but under Section 841A1, the government can prove the jurisdictional amount with pure methamphetamine, and the record reflects that there were 49 grams of pure methamphetamine. That is only one gram short of the jurisdictional amount. So we argued that to the jury as well, that if you take any of the prior methamphetamine and aggregate it with that amount, you reach the jurisdictional amount. Minus one? What's that? Minus one? We were one gram short from the Vargas hotel room search alone. So 49 pure out of 170. Right. 49 pure out of 50 needed for the jurisdictional amount. No, no, I understand the 50, but it's the 49 grams of pure out of 170 grams of the mix. Yes, yes. Okay. And the evidence ticket, and I know we submitted the exhibits for the court's review. The evidence ticket, it's Exhibit 9-0 that has that evidence on it, Your Honor. Is that 90 or 9-0? It's 9-0. Okay. It looks like 90, though. And then the third matter, which was argued to the jury, Your Honor, was under the bed in Motel 6 we have $26,000. The testimony in the case from Christy Cota and others was that the wholesale value of these sales was $1,200 a gram. That represents essentially 21 grams bought and sold. That gets you over the 500-gram threshold itself as well. So really there were three ways in which we endeavored to prove the amount. It's hard to say which one the jury relied upon or whether it relied upon them all. Turning to the withdrawal issue then, and I want to make sure that I understand the timing here. As I understand it, Mr. Copp was arrested on November the 14th for the church incident. So the third, it wasn't the detention. And at that point his car was seized, but he was released, and he was given a ticket for driving without insurance. As I understand the record in PSR paragraph 18, he wasn't arrested until six days later on November the 18th. And then Christy Cota was arrested in the controlled by the next day on the 19th, and that the Vargas motel room search occurred early the next morning on the 20th. So I don't think we're talking about six days. I think we're talking about less than two days between the time when Copp was arrested and the time when the whole search went down. I think six days, obviously, it's a better argument for the defense, but less than two days, it really becomes relevant for us to inquire as to whether or not there had been a withdrawal, whether or not what was found in the Vargas room was really a reflection of what was going on only two days prior. So there were other co-conspirators that were being rounded up as well between the 18th and the 20th? Brett Sheeler was arrested, and he led us to Cota, and Cota was arrested, and she fingered Vargas and Copp. So did Vargas get arrested on the 20th then? You know, I'm not exactly sure when he was arrested. I don't know if he – I'm not sure if he was present at the time of the actual motel search, Your Honor. I don't have an answer. How many co-conspirators did you identify? Well, there were some 25. This was a larger drug conspiracy. You're going to see another one of these cases coming from our district shortly, one of the fellows that's mentioned by Ms. Cota in her testimony. So there were a number of spokes in this conspiracy, obviously, and this one was a fairly defined scope involving Cota and Copp. The withdrawal issue, though, you know, I think that Judge Tolman, you mentioned it. The jury really had facts here from which they could reasonably infer that Copp had been arrested before, and he hadn't withdrawn. He'd gotten right back into the business. And the record does reflect that Ms. Cota, at the time of her arrest, was trying to make some more money to bond him out again. And she had done that in the past, and what had happened was they would bond him out and give him some drugs to get going and he would get started again. So there really is not only no evidence of withdrawal, there's evidence that this had occurred in the past and that the jury could reasonably infer that he was going to do that again. But I think the best argument on withdrawal is only two days later, what was found in that room is a reflection of what was going on. Well, I think those are all fine arguments that could be made, I'm sure were made, but the question is, though, should he have had an instruction on the withdrawal? Now, as I understand, in the Second Circuit they do have a rule, right, that a defendant who presents evidence of arrest and imprisonment is entitled to a withdrawal instruction. I believe that's right, Your Honor. We don't have a rule like that, but we don't have a rule that says no either. No. You have the Johnson case, which I think is the best case on this withdrawal issue, and this circuit has really chosen to sort of go a different direction, which is to say you're going to inquire as to whether there was an affirmative act of withdrawal, but you're also not going to hold a co-conspirator responsible if he is a minor participant. We don't have that here. Kopp wasn't found to be an organizer and leader, but he certainly wasn't a minor participant either. And so the inquiry in this circuit really is different. I don't think he was entitled under the law of the circuit as it exists today to get a withdrawal instruction on these facts, even if he had asked for one. I think the court in exercise of its discretion could have said the record here reflects that he hasn't withdrawn before, and there's no indication that he would have withdrawn this time. Finally, as to the informant files, Your Honors, you know, I just want to make sure that the court is clear on sort of the standard there. It's a very high standard. It's described in the cases as requiring this court to find evidence that would have changed the outcome of the trial in those files. On that point, we had asked that the materials that had been placed under seal be provided to us for purposes of review. But in reading the record, it appeared that the only thing that Judge Siebel marked were the documents that he actually disclosed to Mr. Kopp's attorney, not the entire informant file that he actually reviewed from which those documents were selected, is my understanding of the record correct? Reading from the transcript, it appears that he marks and lists as in camera number one and in camera number two. Two documents of multiple pages. Yes. Yes. But I don't know how I can conduct a review to determine whether or not the district court properly disclosed what ought to have been disclosed if I can't see what it was that the district court was looking at. You're catching me by surprise, Your Honor. I thought the court had the more complete file that was submitted to the court. I have it. It exists, and it can be submitted. Oh, apparently my law clerk is nodding we do have it. Oh, we just received it yesterday. Okay, very good. All right. Well, then let me just address that very quickly. Do you have copies of some documents that you were going to tender to us? I have a full set of each file. It's just my working copy. I grabbed it from my file. Okay, well, if we've got it, then we can share it among the panel. I wasn't aware that the court had trouble getting it. I guess I would have. I don't know that we were having trouble. I was just trying to figure out what it was that we were being provided once you responded to our request. Now, excuse me, but when you're referring to the file, you're talking about the complete informant's file? Yes. All right, go ahead. So there are two of them. One of them is the state file. One of them is the FBI file. If you look at the state file. Well, just a minute. Now, both of those files were submitted to the district judge? Yes. For in-camera review, right? Yes. Okay, go ahead. And the first one, in-camera number one, and it's 52 pages, and it contains the documents that the court listed as being turned over, but it also contains what are contact sheets where the agent who is managing CODA as an informant would write down his notes of what information she would give. And as I pointed out in our brief, all of those contact sheets occurred at times prior to this conspiracy. I think they were all related to other persons who were dealing drugs in and around the area. Obviously, there are issues, concerns regarding other investigations and the safety of people giving that information. We understand the sensitivity. Yes. We're not going to be disclosing the documents. We just want to satisfy ourselves that the district court did what it was supposed to do. And I will, and let me just get to the issue here. Judge Sewell said there's nothing here exculpatory to cop. There's nothing here inculpatory to cop. I think the issue that he didn't at least expressly deal with on the record is whether there was any giglio to CODA, whether or not there were good impeaching matters to CODA. There's only one issue that I could think of that would even be used with regard to CODA, and that is a document at the very end of court in-camera number two, which is the FBI file. And that FBI file does note that they were basically terminating her as an informant because she didn't follow through on a controlled buy with a certain subject they were trying to get. And it turns out that she just basically left, kept the money, and didn't return. And you'll see it in the last page. She took the buy money but never completed the buy. Walked out on them, and so they terminated her. So that is the only thing that I could find in here that would be related to, I think, possible bad acts or something that could have come up in the cross-examination. You can read the cross-examination of CODA, obviously, and most of these issues did come up, that she had been an informant, that she knew all the drug dealers in town, and she listed a number of them. And that she was paid for her work. And that she was paid for her work. She was paid for work she didn't do. Work attempted as well as completed. But returning back to the court standard and from the Mendoza-Prado case of this circuit, it's clear that those items have to be more than that. They really have to be central to an issue that is central to the trial. And that's just not what we have here. And, finally, I would mention that in the Striffler case, which is an earlier Ninth Circuit case on this issue, the court did say, you know, cumulative evidence of Brady or Giglio isn't enough either. I mean, if it comes out otherwise, then that's simply not the type of determinative issue that we're concerned with. I can see that my time is almost out. I would like to just briefly state that as to the expert issue, that was on plain error. I don't think that there was any great value to the testimony. I would agree with the defense on that. But it certainly didn't go to the ultimate issue in this case. And it was harmless. It didn't affect the outcome of the trial. I don't even know why we needed it here. That was my reaction, too. This keeps happening where we get up here on issues on appeal, and then not just you but others say, you know, we really didn't need that. And then you say, well, you know, you might have thought of that before. It's always this desire to just get every possible thing into the record just in case. I agree. And I think that where this court has been most concerned with it in other cases is in the drug courier case. Correct. We don't have that here. It astounds me. I looked at his testimony and I thought, really? The jury needed to be told that these were the tools of the drug trade? This is sort of common knowledge. A scale with methamphetamine, you know. Cell phones. Anyway, we appreciate your candor. And on the issue of Rule 404 evidence, I think, contrary to the defense, that it did go to a material issue. It had to do with his pattern of drug dealing. And, obviously, he continued the same sort of course of action into the conspiracy. And then, finally, on the first issue, the search issue, which I don't want to go into at all other than to say, you know, if we suppressed all that evidence, it really wouldn't affect quantity here, and that's the point. And so we don't need to deal with that. If the court has any further questions, I would be happy. No, thank you. Thank you. Just say something real briefly about the informant file issue. It is true that this court has stated that the standard of review is for clear error. I would suggest, however, is that the clear error should be, the question is, is whether the court clearly erred in that he didn't, the court didn't provide the defense with Brady information. And Brady information, of course, is defined as something that could affect the outcome or confidence in the outcome of the case. I haven't seen what would, obviously I haven't seen what's in the file, but from what Mr. Johnson just said, it appears as though there was Brady information in that file. Well, I mean, I guess that depends on whether you characterize Giglio as a subset of Brady or not. But I understand Brady in the more traditional sense to be actual exculpatory. In other words, there's something in those records that suggests that Mr. Kopp is not engaged in the business of dealing drugs. Maybe I should say Brady or Giglio. Yeah. And we understand the standard in terms of constitutional error. And so I just suggest that that information should have been provided to counsel so that he could look at it with an advocate's eye and determine how to use it. I have nothing further. Thank you. Thank you, gentlemen, for coming from Montana. The case of United States v. Kopp is submitted. We're adjourned.
judges: Tashima, McKeown, Tallman